JAMES ATCHLEY, Plaintiff-Appellee, *v.* JOE BERLEN *et al.*, Defendants-Appellants.

Third District   No. 79-43

Opinion filed August 12, 1980.

Sidney Z. Karasik, of Chicago, and Sheldon W. Reagan, of Kankakee, for appellants.

Robert D. McKnelly, of Watseka, for appellee.

Mr. JUSTICE BARRY delivered the opinion of the court:

This is an appeal from a judgment of the circuit court of Kankakee County awarding to the plaintiff, James Atchley, $45,000 for injuries suffered in a fall at the defendants' meat packing plant, and from a subsequent order of the circuit court granting the plaintiff's motion for a new trial on the issue of damages only. For the reasons stated hereafter, we affirm.

The facts relevant to this appeal are as follows. The defendants, Joe Berlen, Jim Argyropolous, and Joseph Maffei, owned a business known as "Tripoles Packing," and operated a slaughterhouse and meat packing plant in Grant Park, Illinois. The plaintiff, Atchley, was employed by the State as a meat inspector, and visited the plant on a daily basis. Atchley had worked at the defendants' plant as a meat inspector as early as 1970. He suffered back problems as a result of a 1971 fall at defendants' plant, and was virtually incapacitated until March 1973. In that month, he returned to work, and despite wearing a brace for a drop foot condition, was able to perform all of his duties without difficulty.

The office of the meat inspector at the Tripoles plant is located on the second floor. However, the actual inspection of the animal carcasses is done on the floor below, the "kill floor." The plaintiff normally reached the kill floor by walking down a concrete ramp connecting that floor with the second floor. This ramp was not equipped with handrails, and its surface was smooth.

On the day in question (July 17, 1973), the ramp was slick with blood and grease from recently slaughtered animals. Prior to proceeding down the ramp to inspect a carcass, the plaintiff requested that defendant Berlen clean off the ramp with a hot-water hose located at the bottom of the ramp. Berlen, however, refused. The plaintiff then proceeded down the ramp. When he was about halfway down the ramp, his feet flew out from under him and he fell, injuring his back. Although he was in a great deal of pain, he finished work that day.

Shortly thereafter, the plaintiff was admitted to a Kankakee hospital, where he was treated for 17 days. Treatment included pelvic traction, passive physical therapy, and administration of medication to relieve his almost constant pain. Subsequently, he was transferred to Northwestern Memorial Hospital in Chicago, where surgery revealed a herniated disc at the location indicated by previous myelograms. A laminectomy was then performed upon his lower back. Three weeks later he was discharged and instructed not to bend, lift, or stoop. Because of the pain, the plaintiff's physician, Dr. Siqueria, prescribed the use of a back brace in March 1974. Two months later, Dr. Siqueria declared the plaintiff to be permanently

disabled. Although he could engage in a sedentary occupation, he was no longer physically able to fulfill his duties as a meat inspector. As a consequence, the Director of Meat and Poultry Inspection requested the plaintiff's resignation in 1975.

On July 16, 1974, the plaintiff filed the instant personal injury action against the defendant. In his complaint, the plaintiff alleged that the defendants were negligent in failing to maintain the ramp in a safe condition and in failing to install handrails on the ramp. The case was subsequently tried before a jury, and at the close of the plaintiff's case the defendant moved for a directed verdict on the grounds that the plaintiff was contributorily negligent as a matter of law. This motion was denied. The jury eventually returned a verdict in favor of the plaintiff and awarded him damages of $45,000, but the trial court, stating that in his opinion the damages were in excess of $300,000, granted the plaintiff's motion for a new trial on damages only.

■■ On appeal, only two issues are raised for our consideration. The first is whether the trial court erred in denying the defendants' motion for a directed verdict at the close of the plaintiff's case in chief. The defendants contend that the evidence reveals the plaintiff to have been contributorily negligent as a matter of law, and that consequently their motion should have been granted. The standard to be used in determining whether contributory negligence exists as a matter of law is the same as that used in determining whether a directed verdict or judgment *n.o.v.* was proper: does all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favor the movant that no contrary verdict based on that evidence could ever stand (*Mundt v. Ragnar Benson, Inc.* (1975), 61 Ill. 2d 151, 335 N.E.2d 10; *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504; *Rhoades v. W.E. O'Neil Construction Co.* (1980), 80 Ill. App. 3d 1117, 400 N.E.2d 1035). Viewing the evidence in a light most favorable to the plaintiff, we cannot say that as a matter of law the plaintiff was contributorily negligent.

■■ In contending that the plaintiff was in fact contributorily negligent as a matter of law, the defendants argue that the plaintiff had at least two other ways to get to the kill floor from the second floor, yet consciously chose the more dangerous means of access. It is well settled that if a plaintiff has available to him two different ways of proceeding, one dangerous or hazardous and the other safe, consciously chooses the former, and is injured as a consequence, he is contributorily negligent as a matter of law (*Harris v. Union Stock Yard & Transit Co.* (1975), 29 Ill. App. 3d 1072, 331 N.E.2d 182; *Reid v. Employers Mutual Liability Insurance Co.* (1973), 14 Ill. App. 3d 174, 302 N.E.2d 108; *Day v. Barber-Colman Co.* (1956), 10 Ill. App. 2d 494, 135 N.E.2d 231). However, in the instant case the plaintiff did not have another available route to the kill

floor. It is true that access to the kill floor from the second floor could be obtained in one of three ways: A person could walk down the ramp connecting the kill floor with the second floor (the route taken by the plaintiff); go outside and around the building, climb a fence, walk through the livestock pens, and enter the kill floor through a door normally used to bring in livestock; or go outside the building, walk around it, enter the "inedible room," and descend a different ramp leading to the kill floor. Neither of these latter two means of access, however, presented a viable alternative to the plaintiff because both the livestock pens and the inedible room contained contaminants. The only choices actually available to the plaintiff were to proceed down the ramp or remain in his office on the second floor, in which case he would be unable to fulfill his duties as a meat inspector.

In addition, the record reveals that the plaintiff did all he reasonably could have done to make the ramp safe before he proceeded. He requested that the ramp be cleaned (which request was refused by defendant Berlen), and, despite defendants' suggestion that the plaintiff could have compelled the cleaning of the ramp by closing down the plant, his authority to close the slaughterhouse was limited to only those instances when conditions in the plant created the possibility of direct product contamination. The plaintiff did not have the authority to close the plant simply because blood and grease had accumulated on the floors. Therefore, the plaintiff could not have used his authority to close the plant as a lever to force the defendants to clean the ramp.

The defendants further contend that the plaintiff, as a result of his infirmity, a drop foot, was under a responsibility to use greater care in proceeding down the slippery ramp than that required of one without such an infirmity. "[I]t may be incumbent on one with a physical disability to put forth a greater degree of effort than would otherwise be necessary in order to attain that standard of care which is required of everyone" (65A C.J.S. *Negligence* §142 (1966); *Accord*, Prosser, Torts, §32 (4th Ed. 1971)). However, the defendants have presented no evidence that the plaintiff, although cognizant of his infirmity, failed to meet the standard of care which the law imposes upon him. For this reason, the defendants' argument that the plaintiff failed to meet the applicable standard of care is without merit.

> "To be guilty of contributory negligence as a matter of law it must appear that all reasonable minds would agree that assuming the facts as presented by the plaintiff and all reasonable inferences that may be drawn therefrom in her favor, plaintiff is nevertheless guilty of contributory negligence. [Citations omitted].
>
> Whether a plaintiff is guilty of contributory negligence is ordinarily * * * a question of law only when the evidence is so

clearly insufficient to establish due care that all reasonable minds would reach the conclusion that there was contributory negligence."

(*Swenson v. City of Rockford* (1956), 9 Ill. 2d 122, 128, 136 N.E.2d 777, 780.) Reviewing the record, we are of the opinion that the evidence in this case establishing due care is not so insufficient so as to take the question of contributory negligence away from the jury. The defendants' motion for a directed verdict was properly denied.

■■ In an associated argument, the defendants contend that because the slippery condition of the ramp caused by the accumulation of blood and grease was an obvious danger known to the plaintiff as a business invitee, or was a risk inherent in the plaintiff's job as a meat inspector, the defendants were relieved of their duty to use reasonable care in the maintenance of the ramp. Although the defendant relies on three main cases (*Washington v. Atlantic Richfield Co.* (1976), 66 Ill.2d 103, 361 N.E.2d 282; *Fancil v. Q.S.E. Foods, Inc.* (1975), 60 Ill. 2d 552, 328 N.E.2d 538; *Dini v. Naiditch* (1960), 20 Ill. 2d 406, 170 N.E.2d 881), *Fancil* is the case most illustrative of the defendants' argument. In *Fancil*, a policeman (business invitee) was slain by a burglar while making a security check at the defendant's store. The administrator of the slain policeman's estate subsequently brought a common law negligence action against the defendant. The supreme court pointed out that under section 343 of the Restatement (Second) of Torts, the duty of a possessor of land to use reasonable care to protect an invitee against known dangerous conditions on the premises is based upon two factors: First, the dangerous condition must constitute an unreasonable risk of harm to the invitee (Restatement (Second) of Torts §343 (a) (1965)); second, the possessor of the land should expect that the invitee will not discover or realize the danger, or will fail to protect himself against it (Restatement (Second) of Torts §343 (b) (1965)). 60 Ill. 2d 552, 557, 328 N.E.2d 538, 541.

In *Fancil*, the supreme court held that under the provisions of the Restatement, no cause of action was stated by the plaintiff administrator. The court reasoned that because the danger of being ambushed by criminals was a risk inherent in police activity, the danger to which the deceased police officer was subjected was not an unreasonable risk. Further, the fact that the officer was armed indicated that he not only realized the dangers involved in his occupation, but was also protecting himself against those dangers. The defendants endeavor to analogize *Fancil* to the instant case by contending that the danger of slipping on a ramp greasy with blood from slaughtered animals is a risk inherent in the plaintiff's occupation as a meat inspector, the plaintiff was well aware of this risk, and consequently his decision to act despite the risk involved excused the defendants from their duty to maintain the ramp in a safe

condition. However, the defendants' attempt to make the analogy fails because the risk present in this case is not necessary nor inherent in the occupation itself, as was the case in *Fancil* (for police officers) or *Washington* (firemen). The occupations of police officers and firefighters are inherently dangerous. Police officers and firemen subject themselves to the possibility of bodily harm and even death every day. It is a risk that cannot be avoided. This does not hold true for the risk involved in the instant case. Certainly, it is to be expected that a certain amount of blood and grease will accumulate on the floors of a slaughterhouse, but the risk created by such a condition can be easily avoided by periodically cleaning the floors when the conditions create a hazard. Indeed, the record in this case reveals that a hot water hose was located at the bottom of the ramp on which the plaintiff fell for the express purpose of hosing down the ramp and the immediate area. The risk here, as opposed to the risk in *Fancil*, was not inherent in the occupation of the plaintiff. Rather, it was created by the negligence of the defendants. *Fancil* and the other cases cited by the defendants are therefore inapposite to the case at bar.

The final issue to be considered in this case concerns the propriety of the trial courts' granting of the plaintiff's motion for a new trial on the issue of damages only. The facts relevant to this issue are briefly as follows. Prior to the fall in July of 1973, the plaintiff had a history of back problems, and had undergone three laminectomies. After his third laminectomy in February of 1973, the plaintiff had a complete recovery, except for the foot drop. He was not only able to perform his duties as a meat inspector, but also was able to engage in a number of leisure activities such as house painting, gardening, and fishing. After the July 1973 fall, he was hospitalized for a total of approximately 38 days, and underwent a fourth laminectomy. During this period of hospitalization, the plaintiff was in severe pain. As we have previously stated, in 1974 he was fitted with a back brace, and was found by his treating physician to be permanently disabled. As a consequence, he was forced to resign from his job as a meat inspector. In 1976, the plaintiff was hospitalized for bladder problems caused by previous back surgeries and continued urinary infections. Despite treatment, the plaintiff's bladder problems continued, and as of the time of trial he was still receiving treatment and medication for his bladder and urinary infection difficulties. In December of 1976, a fifth laminectomy was performed upon the plaintiff. The plaintiff is no longer able to engage in active recreational activities, and, aside from the bladder problems, must take medication every three hours to alleviate the pain in his back and legs.

As of the date of trial, the plaintiff had incurred $19,983.68 in medical expenses, and his loss of earnings from the date of the injury to the time of trial (4 years, 10 months) was approximately $44,000. In addition, the

plaintiff claims that his loss of future earnings due to the fall was at least $63,000. Taking the medical expenses proven, the loss of past and future earnings, and the plaintiff's pain and suffering into account, the plaintiff contends that the $45,000 verdict was erroneous, and urges this court to affirm the trial court's granting of his motion for a new trial on the subject of damages only.

■ Determining whether the granting of plaintiff's motion for a new trial on damages only was proper requires a two-part analysis. Firstly, it must be ascertained whether the jury verdict was palpably inadequate. Given the fact that the fixing of unliquidated damages in a personal injury case is primarily a jury function (*Horton v. City of Ottawa* (1976), 40 Ill. App. 3d 544, 352 N.E.2d 23; *Davis v. Yellow Cab Co.* (1971), 133 Ill. App. 2d 190, 273 N.E.2d 35), a trial court should not overturn a jury's finding on the basis that the award is inadequate unless it is palpably inadequate or against the manifest weight of the evidence (*Palmer v. Avco Distributing Corp.* (1979), 75 Ill. App. 3d 598, 394 N.E.2d 480). In the case at bar, the jury's verdict failed to compensate the plaintiff for those elements of damages he has clearly proven. Indeed, the jury's award is less than his proven out-of-pocket expenses, which we compute to be nearly $64,000 ($19,983.68, medical expenses, plus $44,000 in lost wages to date of trial). "Under the posture of the evidence in this case a verdict in a lesser amount than the uncontradicted out-of-pocket expenses is manifestly inadequate—indisputably insufficient." *Kelly v. Reynolds* (1971), 132 Ill. App. 2d 1098, 1103, 271 N.E.2d 370, 373. Accord, *Robin v. Miller* (1978), 67 Ill. App. 3d 656, 384 N.E.2d 889; *Kelty v. Wiseman Construction Co.* (1976), 38 Ill. App. 3d 808, 349 N.E.2d 108.

Although we hold that the jury's $45,000 verdict was palpably inadequate in light of plaintiff's out-of-pocket expenses and the other elements of damage proven by the evidence to have resulted from defendants' negligence, such does not necessarily mandate the granting of a new trial on the issue of damages only.

> "Where it appears that a damage verdict is a result of compromise on the issue of liability, the case may not be retried on the issue of damages only, for to do so could impose an injustice upon the defendant. Thus, a new trial, limited to the issue of damages, may be had only 'where the damage issue is so separable and distinct from the issue of liability that a trial of it alone may be had without injustice.' (*Paul Harris Furniture Co. v. Morse*, 10 Ill. 2d 28, 46 (1956); see *Szwankowski*, at 274-76). To test whether a verdict is the result of compromise, it must be determined if the verdict was amply supported by the evidence. (*Harris*, at 46). If the record discloses sufficient evidence for the jury to find defendant liable, the court may order a new trial on the issue of damages only. (*Cf.*

*Maguire v. Waukegan Park District,* 4 Ill. App. 3d 800, 804 (1972); *King v. City of Chicago,* 53 Ill. App. 2d 484, 486-87 (1964).)" (*Kelty v. Wiseman Construction Co.* (1976), 38 Ill. App. 3d 808, 813, 349 N.E.2d 108; accord, *Robbins v. Professional Construction Co.* (1977), 45 Ill. App. 3d 524, 359 N.E.2d 1121, *aff'd* (1978), 72 Ill. 2d 215, 380 N.E.2d 786.) In the instant case, the record discloses the negligence of the defendants by a clear preponderance of the evidence. The jury verdict on the issue of liability was amply supported and should not have led to a compromise by the jury on the issue of damages. Based upon this and the palpable inadequacy of the verdict, we believe that the trial court did not abuse its discretion in granting a new trial on the issue of damages in this cause.

For these reasons, the judgment of the Circuit Court of Kankakee County is affirmed.

Judgment affirmed.

ALLOY, P. J., and STENGEL, J., concur.